IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| ELVIR PUROVIC, JERRY JOY, CODY COULTON, SEBASTIAN OTTAPLAKAL, JAMES FRANCIS, and SHALINI VINOD,<br><br>*Plaintiffs*.<br><br>v.<br><br>VINCENT GAETANO LOMBARDI, ROBERT REAL, JASPER WILLIAM YONKER, BRAD MESSIER, JASON MORROW, JOHN/JANE DOES 1-20, SARASOTA PAVER SEALING PROS LLC, SEO COMPANY SARASOTA LLC, ULTIMATE KAYAK SRQ LLC, UNREAL EXOTICS LLC, and XDRIP DIGITAL MANAGEMENT LLC,<br><br>*Defendants*. | Case No.____2:25-cv-13911<br><br>Hon. ______________________<br><br>**COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS, CIVIL RICO, AND MICHIGAN STATUTORY AND COMMON LAW**<br><br>**JURY TRIAL DEMANDED** |

Michael Chehab (P79912)
Blue Oak Law Firm PLLC
Attorney for Plaintiffs
38410 Westchester Rd
Sterling Heights, MI 48310
(586) 353-5289
mchehab@blueoaklawfirm.com

**COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS, CIVIL RICO, AND MICHIGAN STATUTORY AND COMMON LAW**

Plaintiffs, by and through their undersigned counsel, bring this action against Defendants Vincent Gaetano Lombardi, Robert Real, Jasper William Yonker, Brad Messier, Jason Morrow, and John/Jane Does 1–20, who aided in the alleged scheme as promoters, moderators, and/or developers of the token and scheme alleged herein (collectively "Defendants" or "Zelda Team").

This Complaint also names corporate entities owned or controlled by the individual defendants that were used to facilitate the scheme or are believed to have received diverted funds: Sarasota Paver Sealing Pros LLC, SEO Company Sarasota "LLC" (quotes in original), Ultimate Kayak SRQ LLC, Unreal Exotics LLC, and XDRIP Digital Management LLC.

The allegations in this Complaint are made upon information and belief of counsel (except as to those allegations pertaining to Plaintiffs, which are based on personal knowledge), founded on an extensive investigation, including analysis of blockchain records, review of official project communications on Telegram, YouTube, and Twitter, personal social media postings, state corporate filings, and other available information (deleted by Defendants following receipt of Plaintiff's notice of preservation, but had been preserved in large part by Plaintiff's counsel).

## I. INTRODUCTION

1. This action arises from a cryptocurrency scheme where Defendants solicited hundreds of thousands of dollars from investors across the United States and abroad under the guise of a "crypto charity to save dogs," but instead used funds to purchase Lamborghinis, luxury watches, and otherwise misappropriated funds for personal use.

2. Through a series of misrepresentations, market manipulations, and technical execution of advanced code-based functions, Defendants, led by Vincent Gaetano Lombardi, Jason Morrow, Robert Real, and Jasper William Yonker, induced Plaintiffs, including Elvir Purovic, a resident of Macomb County in this Judicial District, and hundreds of others to invest in digital tokens named "Zelda Inu" and "Zelda 2.0."

3. The Defendants represented to investors, through official whitepapers, social media communications, and live "Ask Me Anything" (AMA) sessions, that the tokens were a legitimate,

secure, long-term investment project that would generate significant returns (promising, for example, "get ready for a smooth 500X" returns), while significant proceeds being used to save the lives of dogs at overcrowded or underfunded kill shelters.

4. In reality, the projects were structured enterprises designed from inception to enrich Defendants at the expense of investors in Michigan and throughout the U.S. and abroad.

5. The scheme incorporated multiple layers of deception calculated to induce trust and maximize the funds Defendants could misappropriate.

6. These deceptions included: false promises of “100% Locked Liquidity”, in which Defendants represented that 100% of the project's investment-funded liquidity pool could not be accessed or removed by anyone (including project creators). This was materially false.

7. The Defendants created the illusion of community support by deploying approximately 4,500 automated “bot” accounts before publicly announcing the Zelda 2.0 project to create the false appearance of organic community interest and trading volume.

8. The Defendants also programmed a "blacklist" function into the Zelda 2.0 smart contract that gave them the power to freeze any wallet address, preventing token holders from selling or transferring their tokens and trapping their investments in the liquidity pool.

9. The deceptions culminated in a coordinated “Rug Pull” beginning on the day of the May 5, 2024 – the Zelda 2.0 token launch. Immediately after launch, Defendants began to blacklist/freeze the wallets of large token holders and proceeded to remove funds from the investment liquidity pool through selling undisclosed token holdings and direct transfers.

10. Rather than using the funds for the promised charitable causes, Defendants diverted investor capital to personal wallets and centralized exchanges, subsequently funding the purchase of luxury assets including a Lamborghini Urus and a Nissan GTR.

11. This scheme follows a pattern – as in late 2021/2022, Defendants launched the "Zelda Inu" token, made similar misrepresentations, and subsequently shut down that project while promising a "migration" to a new token called "ZeldaVerse" and later Zelda 2.0.

12. Hundreds of investors sent their Zelda Inu tokens to Defendant-controlled wallets for conversion but never received anything in return.

13. Defendants then launched Zelda 2.0 with the same misrepresentations to a new group of victims, executed the same fraud, and again absconded with investor funds.

14. This action seeks to hold Defendants accountable for violations of federal securities laws (Securities Act §§12(a)(1) and 12(a)(2), and Securities Exchange Act §10(b) and Rule 10b-5), the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§1962(c) and (d)), and Michigan statutory law (MCL §445.903 et seq.) and common law (fraud, negligent misrepresentation, breach of fiduciary duty, civil conspiracy, unjust enrichment, and conversion), and to recover the funds stolen from the Plaintiff' victims of this scheme.

## II. JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, Section 22(a) of the Securities Act of 1933 (15 U.S.C. § 77v(a)), and Section 27 of the Securities Exchange Act of 1934 (15 U.S.C. § 78aa), and under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq.

16. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a), as those claims are so related to the federal securities law claims that they form part of the same case or controversy under Article III of the United States Constitution.

17. This Court has personal jurisdiction over all Defendants because they purposefully directed their activities toward residents of the State of Michigan and this District. Defendants utilized interstate instrumentalities (Telegram, YouTube, X/Twitter) to solicit investments from Michigan residents.

18. This Court has specific personal jurisdiction over Defendants pursuant to the Sixth Circuit's "stream of commerce plus" and "targeting" standards. *See Parker v. Winwood*, 938 F.3d 833 (6th Cir. 2019). Defendants did not merely operate a passive website accessible in Michigan; but directly interacted with these individuals via Telegram and actively utilized an interactive smart contract to knowingly consummate commercial transactions with residents of this District, and engaged in active, real-time solicitation of Michigan residents.

19. During both Telegram chats and during online "Ask me Anything" sessions, Defendants requested and responded to specific inquiries from potential investors, including Michigan participants, and provided tailored investment advice that sought to induce the immediate transfer of assets from their Michigan-based wallet(s).

20. Several additional Michigan investors who were active in the Zelda 2.0 $ZLDA Official Telegram channel were also directly targeted for investments by Defendants. For example, on March 18, 2024, one Michigan investor conversing on Telegram with Defendant Lombardi asks

him if he expected Zelda 2.0 to increase "more than a 300x?" was told ". . . [w]ith a smaller start LP [than the Zelda Inu project] we should do 300x easy." (Exhibit C: Communications at 1).

21. These solicitations were mostly preserved by counsel. However, the details including the user's profile information and contact details, which were available to counsel and not directly exportable, were deleted by Defendants after receiving notice of preservation.

22. Additionally, Defendants committed intentional torts expressly aimed at this District. Defendants targeted assets located in Michigan, knowingly causing financial injury to a resident of this State. Under the "Effects Test" of *Calder v. Jones*, 465 U.S. 783 (1984) and Sixth Circuit precedent in *Bird v. Parsons*, 289 F.3d 865 (6th Cir. 2002), these purposeful contacts sufficiently establish specific jurisdiction.

23. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to these claims occurred within the Eastern District of Michigan. Specifically, Plaintiff Purovic received the fraudulent solicitations in this District, executed the purchase transactions, and suffered the financial injury and loss of property in this District.

## III. PARTIES

### Plaintiffs

24. This action is brought on behalf of 6 individuals (the "Plaintiffs") who invested in the "Zelda 2.0" cryptocurrency project and collectively lost more than US $62,011.58 in blockchain-verified investments. (Exhibit A: Losses Table).

25. Plaintiff Elvir Purovic is an individual residing in the County of Macomb, State of Michigan. Plaintiff Purovic owned and controlled a cryptocurrency wallet located in Michigan. Relying on Defendants' representations, he invested approximately 0.039 Ethereum ("ETH") in the Zelda 2.0 token (worth approximately USD $118.40 at the time). The Defendants' scheme caused Mr. Purovic to suffer a total loss of his investment.

26. Plaintiff Cody Coulton is a Canadian resident who invested approximately 9.186 ETH (worth approximately $28,791.09 at the time in the Zelda 2.0 token. After the Zelda 2.0 launch, his wallet was wrongfully blacklisted. Following over a month of "investigating" the issue, Defendant Vincent Lombardi apologized and admitted that Mr. Coulton's wallet was wrongfully blacklisted and provided him with "replacement" tokens (after the token price and liquidity had crashed). These tokens were sold for approximately $1,767.83 (Ex. A), leaving Cody with a net loss of approximately $27,023.26.

27. Plaintiff James Francis is a Canadian resident who invested at least 7.86 ETH (worth approximately $25,472.37 at the time) in the Zelda 2.0 token. His primary wallet was wrongfully blacklisted, freezing most of his investment as liquidity was withdrawn. Jimmy also suffered losses from his investment in the earlier Zelda Inu project, in which he purchased approximately $3,000 worth of tokens and was asked to transfer them to a developer-controlled wallet for conversion into new tokens. He complied but no investor received anything in return.

28. Plaintiff Sebastian Ottaplakal is an individual residing in New York, USA, who invested at least 0.666 ETH (worth approximately $2,031.78 at the time) in the Zelda 2.0 token in reliance on Defendants' representations and suffered a total loss of investment.

29. Plaintiff Jerry Joy is an individual residing in Dubai, U.A.E., who invested at least 0.79 ETH (worth approximately $2,471.48 at the time) in the Zelda 2.0 token in reliance on Defendants' representations and suffered a total loss of investment.

30. Plaintiff Shalini Vinod is an individual residing in Dubai, U.A.E., who invested at least 1.0564 ETH (worth approximately $4,894.29 at the time) in the Zelda 2.0 token in reliance on Defendants' representations and suffered a total loss of investment.

**Defendants**

31. Defendant Vincent Gaetano Lombardi is a citizen of Florida, residing in Sarasota County. Lombardi was the self-proclaimed "mastermind" and creator of both Zelda Inu and Zelda 2.0, listed as part of the official "Team" in both tokens' official "whitepaper." (Exhibit B: Zelda Inu and Zelda 2.0 Whitepapers, at 9, 20). He acted as the public leader and central spokesperson for the projects, having appeared in multiple online Q&A sessions and promotional videos. Defendant Lombardi made significant material representations regarding the tokens, including their charitable mission and profit potential, and held undisclosed tokens later sold for profit. He utilized the proceeds of the scheme to purchase, among other things, a Lamborghini Urus (Exhibit E: Luxury Purchases and Comingling).

32. Defendant Jasper William Yonker is a citizen of Massachusetts, residing in Suffolk County. Upon information and belief, Defendant Yonker had resided and worked in the State of Florida through 2021 – 2025. Yonker was a key developer in both the Zelda Inu and Zelda 2.0 projects, being listed officially in both token's whitepapers where he is described as "The Brains." (Ex. B at 9, 20). In interviews and to the public, Yonker is introduced as Zelda Inu's "Top

Dev[eloper]," (Ex. C at 2) and the Zelda 2.0 developer ("our Dev[eloper]") (Ex. C. at 3). Yonker was described as a high-profile business strategist and financial advisor for Zelda 2.0, being Vice President of a 150–200-member software development company, and was tasked with reviewing the blacklisted wallets in at least one official communication . (Ex. C. at 4).

33. Defendant Robert Real is a citizen of Florida, residing in Sarasota County. He is listed officially as a team member in both the whitepapers, (Ex. B at 10, 21), where he is described as "The Hype Man." Defendant Real appeared in many Q&A sessions and interviews, where Mr. Lombardi referred to him as his "side-by-side partner." (Ex. C at 2). He moderated the online investor communities and participated in promotional events.

34. Defendant Jason Morrow is a citizen of Indiana, residing in Tippecanoe County. Morrow was involved in both Zelda Inu and Zelda 2.0, publicly as a promoter.

35. Defendant Brad Messier is a citizen of Colorado. Messier promoted the Zelda Inu and Zelda 2.0 projects through his marketing company and social media influence. He assisted in expanding the reach of the scheme and believed to have received compensation.

36. Defendants John/Jane Does 1–20 are individuals whose true names are currently unknown. These persons participated in the scheme as partners or assistants to the named Defendants. Partial information (such as Telegram handles) and additional information uncovered is included in Exhibit D: Doe Defendants.

37. Corporate Defendants: Defendants Sarasota Paver Sealing Pros LLC, SEO Company Sarasota LLC, Ultimate Kayak SRQ LLC, Unreal Exotics LLC, and XDRIP Digital Management LLC are limited liability companies owned or controlled by the Individual Defendants. These entities

were believed to have been used as alter egos to funnel and conceal investor funds, ignoring all corporate formalities, and believed to have commingled corporate and personal funds for personal luxury purchases including a Lamborghini Urus. (Ex. E). The corporate veil should be pierced to hold these entities directly liable for the individuals' alleged fraud.

## IV. FACTUAL ALLEGATIONS

### A. The Mechanism of Control: Smart Contracts and Liquidity Pools

38. A <u>cryptocurrency token</u> is a digital asset created and governed by computer code tied to a blockchain. A <u>blockchain</u> is a continuously updated ledger/record of transactions maintained across a network of computers (rather than by a single central computer).

39. Tokens are governed by <u>smart contracts</u> – self-executing programs stored on a blockchain. The smart contract automatically enforces predetermined rules and conditions.

40. Smart contracts can be written to include <u>functions</u> that provide individuals with the ability to control various aspects of the token, such as the ability to transfer or mint new tokens.

41. One function that can be programmed into a smart contract is a "<u>Blacklist</u>" function, which prevents a specific wallet from selling or transferring tokens.

42. The functions are typically controlled via a "<u>Deployer Wallet</u>."

43. In some cases, a token creator may <u>renounce ownership</u> of the token's smart contract, which removes the owner of the Deployer Wallet's control over the token and its

administrative functions. Pre-programed functions can be built into the smart contract prior to renounced ownership, such as to automatically transfer liquidity at defined intervals.

44. Trading occurs via "Liquidity Pool" on a Decentralized Exchange (DEX). Investors swap established currency (like ETH) for the new token. If the developers remove the ETH from this pool (a "rug pull"), the token becomes worthless as it can no longer be sold.

45. Defendants represented that the Zelda 2.0 liquidity was "100% Locked," implying they could not remove or withdraw funds from the liquidity pool.

46. When large investor wallets are “blacklisted,” those holders are prevented from removing their tokens from the pool, which artificially props up the token’s price and ensures that insiders retain access to the trapped liquidity. This both keeps funds circulating within the pool (delaying a price collapse) and allows insiders to sell their own tokens at inflated values (while preventing outsiders from doing the same).

**B. Introduction to the "Zelda Enterprise" and the Key Players**

47. Defendants constituted an association-in-fact enterprise (the "Zelda Enterprise") within the meaning of 18 U.S.C. § 1961(4), separate and distinct from each individual Defendant, with the common purpose of enriching themselves through fraudulent cryptocurrency schemes marketed as charitable dog-rescue tokens.

48. The Zelda Inu and Zelda 2.0 whitepapers publicly listed core members: Vincent Gaetano Lombardi, Jasper William Yonker, Robert Jonathan Real, and Jonathan Max Minton. (Ex. B).

49. All of the above Defendants appeared in several interviews, YouTube videos, and were present in the Zelda Inu and Zelda 2.0 official Telegram channels as moderators.

50. The Zelda Enterprise had an ascertainable structure and hierarchy:

51. First, an executive tier (Lombardi as "Mastermind" and ultimate decision-maker; Real as "Hype Man" and Lombardi's "side-by-side partner"; Yonker as "The Brains" and lead developer) that conceived, directed, and controlled the schemes.

52. Second, a technical tier (Yonker, Lombardi, Morrow, and alias "Strange" (@strangerdev)), creating the smart contracts containing blacklist and liquidity-drain functions.

53. Third, a promotional tier (Messier, Real, Morrow, and John/Jane Does including Jason “Goose” DiCosimo, "Bili," and "Amos") that disseminated misrepresentations via social media, YouTube, Telegram, and websites to induce investments.

54. This structure persisted with continuity from at least 2021 through 2025, across the Zelda Inu and Zelda 2.0 projects.

55. This provided closed-ended continuity (repeated predicate acts over four years harming hundreds or thousands of investors).

56. This also provided open-ended continuity (the Enterprise's regular way of conducting business through sequential fraudulent token launches, with threat of repetition absent intervention).

57. Jonathan Minton and additional member Ben Unger (only listed in the Zelda Inu whitepaper) are not included in this complaint at the present time. Plaintiffs reserve the right to amend as to them upon further discovery.

58. Defendant Lombardi was one Zelda team-member who possessed and exercised technical control. E.g., Lombardi was attempting to "solve the glitch issue" during launch; and post-launch "I need to make a few changes on contract." (Ex. C at 5, 6).

59. The anonymous developer "Strange" (@strangerdev) was held out as European but deployer wallet activity showed Florida/Eastern-time zone patterns (daily 04:00-12:00 UTC dormancy), conflicting with separation from other eastern-time zone Defendants.

**C. The Zelda Inu Project (2021-2023)**

<u>Artificially Inflating Support</u>

60. The Enterprise first launched "Zelda Inu," marketing it as a charity token. To induce investment, Lombardi first directed the creation of false social proof – the creation of 4500 fake users and bots to falsely lead potential investors into thinking that this was a project with wide public support and credibility.

61. More specifically, on February 27, 2022, Mr. Lombardi created a new Telegram group for the project. Prior to making the group public, he had added several moderators and project leaders to the channel to discuss the preliminary plan going forward. (Exhibit F: Prior "Zelda Inu" Fraud, at 1).

62. Addressing the Zelda Team, Mr. Lombardi first stated "we will keep [the group to] us until <u>we get bili to add all bots and stuff. Then we will do fake members</u> then make the announcement." (Emphasis added). (Ex. F at 1).

63. Telegram user "Arnold" asked Mr. Lombardi, "how many subscribers" (fake supporters) he wanted. Mr. Lombardi replied, "lets start with 4500." (Ex. F at 1).

64. These “bots” include moderator bots, which are typically programmed to automatically-ban users who complain about a project, publicly air a project grievance, or use specific words in the chat.

<u>Testing Blacklists + Ignoring Pleas</u>

65. The Zelda Inu smart contract contained the same "blacklist" function later deployed in Zelda 2.0.

66. In May of 2022, preserved Telegram messages show one investor, Edgar S., having been blacklisted without reason, and his subsequent pleas for help ignored and delayed for more than 2 months until the token price collapsed. (Ex. F at 2 – 3).

67. On May 8, 2022, Edgar S. states: "I feel like a kid running around all day yesterday sending dms to mods and team members about my wallet being blacklisted out of a sudden but seems like no one gives a []! Why no one answering my messages!!??" (Ex. F at 2 – 3).

68. On June 9, 2022, Edgar S. continues: "I have been sending PMs to Vince and team for a whole month to get my wallet fixed, still no response." (Ex. F at 2 – 3).

69. By July 2022, Edgar S. was told by Mr. Lombardi that Jasper would look into his wrongful blacklisting, (Ex. F at 3)

70. When Edgar S. publicly asked Mr. Lombardi “Did Jasper manage to look at my wallet?” Mr. Lombardi would not discuss Jasper’s review of the wallet publicly and requested that Edgar S. direct message him instead. (Ex. F at 3).

71. Note that a blacklist can be reversed by a deployer wallet in a few seconds via smart-contract function, which was present in both Zelda Inu and 2.0 contracts. (Exhibit G: Blockchain Evidence, at 1 – 4).

72. This incident established a technical and operational roadmap demonstrating that: (1) the blacklist code could function effectively as a tool for asset seizure; (2) the Enterprise could successfully ignore victim complaints with minimal consequences; and (3) delayed or nominal responses could be used to run out the clock while token values declined.

**D. The ZeldaVerse Migration Scheme**

73. In late 2022, as Zelda Inu's price declined, the Enterprise announced a migration to a new platform called "Zeldaverse," asking all token holders to send their Zelda Inu tokens to a developer-controlled wallet for conversion to new tokens. (Ex. F at 4, C at 7).

74. In response, the holders relied on these representations and transferred their tokens with the expectation of conversation or reimbursement.

75. As of November 1, 2025, this wallet held the majority of the total Zelda Inu supply.

76. However, the tokens were never returned or converted, and the Enterprise ultimately enriched itself while defrauding investors of substantial value.

**E. The Zelda 2.0 Scheme (2024 – 2025)**

77. The Zelda project leveraged the perceived success of the Team’s prior project (Zelda Inu) and made various promises to attract individuals to purchase the Zelda ($ZLDA) token.

Misrepresentations and Inducement: Charity to Save Dogs

78. Zelda 2.0 was consistently marketed as a “crypto charity project” with the mission “to save all dogs.” (Exhibit H: Charitable Claims vs. Reality).

79. Through the Zelda 2.0 Official Whitepaper and webpage, Defendants published specific amounts of tokens that would go towards dog rescued. For example, on their official website, they state “DOG RESCUES LOCKED 10%.” (Ex. H at 3).

80. Defendants misled the public by publishing videos, website content, and social media posts which lead viewers to believe that the new token (Zelda 2.0) had donated $75,000.00 to dog charities (posts and videos now removed by Defendants). (Exhibit I: Legal and Spoliation of Evidence).

81. In one example, on the Zelda 2.0’s official YouTube channel, the Zelda Team uploaded a video titled "Zelda 2.0 $75k donated - On the road to $1 million" (now deleted), featuring selectively edited clips from 2021 Zelda Inu project donation(s) made to appear as though they were made recently or were new donations. (Ex. I at 2).

82. To date, there has been no evidence uncovered or provided of any financial donations having been made throughout the existence of the Zelda 2.0 project, and the Enterprise provided no documentation, receipts, or third-party verification of any donations.

83. The only evidence for any Zelda 2.0 funds going towards helping dogs as intended are 2 heavily publicized dog shelter visit, one on May 18, 2024, in which the Team took photos and purportedly covered one dog’s shelter costs (estimated cost of $15/day, $105/week), although no proof of this can be found after extensive blockchain review. (Ex. I at 3).

84. The false charitable narrative was central to the project's marketing identity and was calculated to appeal to investors' humanitarian instincts, create a false impression of legitimacy and trustworthiness, and distinguish Zelda 2.0 from purely speculative cryptocurrency projects.

85. The Enterprise repeated this false charitable theme across multiple platforms, including the official website, which prominently featured dog rescue imagery and language suggesting philanthropic mission.

Expectations of Profit

86. The Zelda 2.0 Team made repeated claims which implied that token purchasers could expect to receive massive profits from their investment. These claims were made via all major communication channels the project utilized as follows:

87. Zelda2.AI Website: "Get ready for a smooth 500X," as well as promises of "Massive Staking" and "Buybacks and Burn: 'don't be alarmed when bombs start dropping on the chart. Sit back and enjoy the ride!'" (Ex. H at 9).

88. Twitter/x.com: "MASSIVE ANNOUNCEMENT: . . . if you missed out or didn't see the 350X return on the first launch, you will have a fair shot this time to get in on launch day." (Ex. C at 7).

89. YouTube: "GET RICH BEING EARLY ON ZELDA 2.0" and "BEST 4HR CHART ON ETH * Zelda 2.0 is taking off. You are not late." (Ex. I at 2).

False Promises of a "Fair Launch"

90. Defendants repeatedly promised a “fair launch” for the Zelda 2.0 token.

91. On May 3, 2024, for example, in a YouTube Ask me Anything (“AMA”) held by the Zelda Team, Defendant Lombardi repeatedly assured investors that this would be a “fair launch for everybody.”

92. Defendant Lombardi also stated expressly: “I have teammates who are going to be buying at launch and they are not whitelisted that that is a fair launch,” (Ex. C at 9), creating the expectation that no party, including the Zelda 2.0 Team, would have an unfair advantage.

93. This was not true. Not only did insiders have presale access to the token, but also several pre-launch transfers were made and later sold. *See e.g.* Tx: 0x36ef2903563bcd2d00e5291 caffe05becd7c54ff4c36c61de87eb78b6c4elcd; 0x606171078d819303018ec638aee2b58a2678b16a84fe0ae846b2c7844a1b3193; *see also* wallet 0x940c9486db900b185b4c6952c0682c15d418a85e; and 0xd4db32036beb4a069cee3f51d20152fb500f27f9.

Misrepresentations and Inducement: “100% Locked Liquidity”

94. The Zelda2.AI official website, which was taken down along with the Zelda 2.0 Whitepaper after, listed as one of six highlights: “100% Locked Liquidity.” (Ex. H at 4).

95. This was expressly false, directly contradicted by various deployer-wallet functions that directly controlled funds and were used to directly transfer liquidity out of the liquidity pool. (Ex G at 3).

<u>"Secure" and "Audited" Falsehoods</u>

96. Defendant's website stated "Certik KYC: We are fully doxxed, qualified and certified Diamond Hands." (Ex. H at 4).

97. This was false and directly contradicted by the Defendant's own statements.

98. First, it omits that the Certik Audit gave it a low score (59/100), and on the same audit says "NO" KYC (false) and no 24/7 Skynet Security. (Ex. C at 9).

99. The Zelda Team, through Defendant Lombardi, recently began claiming that the liquidity transfers and wrongful blacklistings were actually perpetrated by a developer in Europe, @Strangerdev, who in fact had exclusive control over the deployer wallet.

100. Defendant Lombardi has claimed, to counsel, that even he does not know the identity of @Strangerdev, which conflicts with the "we are fully doxxed" (identity fully disclosed to the public) representation. (Ex. H at 4).

101. These demonstrably untrue or misleading representations created a false impression of third-party verification and security, which investors relied on and which Defendant's exploited in taking these users' funds.

**F. The Pretext for Upcoming Acts**

102. Two days before the token's launch, on May 3, 2024, the Zelda Team hosted a heavily publicized "Ask Me Anything" (AMA) session.

103. The event served as a calculated maneuver to establish false pretext for subsequent blacklistings.

104. During the AMA, Defendant Lombardi educated users on purchasing techniques to use at launch (when prices are lowest) to maximize chance of making a successful purchase, including using multiple wallets, paying aggressive "gas fees," and using trading "bots" such as "Unibot" and "MEV Bot." (Ex. C at 8 – 9).

105. Lombardi informed viewers that they would be posting the token's contract address (which is needed in order to purchase the token) on the Zelda 2.0 official Telegram. The Token would first be made active, and within a short period the contract address would be posted. (Ex. C at 8 – 9).

106. As background information, some cryptocurrency investors attempt to utilize programs/bots that scan the blockchain for new tokens and will auto-purchase a small amount as soon as a contract goes live. If this occurs, it would be possible for a person to purchase tokens between the short time between the token going live on the blockchain, and when the purchasing contract address is posted in the group Telegram.

107. Lombardi explained that purchases made after the contract address was posted on Telegram were "fine." However, what was prohibited was "sniping" as he defined it - or purchasing the token "the second [it] goes live." He concluded with a definitive promise: "if you're not doing something like that . . . you're going to be fine." (Ex. C at 9).

**G. The Coordinated Taking**

108. On May 5, 2024, at 18:00 UTC, ZLDA token launched and within a few minutes, its contract address was posted to Telegram.

109. Relying on the Zelda 2.0 Team's promises, advice, and representations, and in no way violating any rules or using "Sniper-Bots," Plaintiffs began to attempt to purchase Zelda 2.0 project dog-charity tokens.

110. Plaintiff James Francis executed his first purchase at 18:04 UTC, 4 minutes after the official announcement. (Ex. A).

111. Plaintiff Cody Coulton also executed his first purchase at 18:04 UTC. (Ex. A).

112. Plaintiffs Francis and Coulton purchased additional tokens through the next few days. (Ex. A).

113. By May 7, 2024, Mr. Coulton had invested approximately $28,791.09 into the Zelda 2.0 project. (Ex. A).

114. By May 7, 2024, Mr. Francis had invested approximately $25,472.37 into the Zelda 2.0 project. (Ex. A).

115. By May 7, 2024, Mr. Purovic had invested approximately $118.40 into the Zelda 2.0 project. (Ex. A).

**H. Mass Blacklists, Withdrawal of Investor Liquidity, Renouncing Contract**

116. Beginning a few hours after the May 5, 2024 token launch the Zelda Team began aggressively blacklisting the wallets of large investors in multiple waves.

117. While the Zelda 2.0 token only had several hundred total holders, by May 7, 2024, the Blacklist function had been executed at least 49 times. (Ex. G at 3 – 4).

118. On May 8, 2024, without warning or reason, Plaintiff Coulton's wallet was blacklisted. Tx Hash: 0xc2318452508ecb5559481c0619c5ee0f9db18db84c8818ea5fc9ef0dfd22f2f6.

119. On May 8, 2024, Plaintiff Francis's largest wallet was also blacklisted. Tx Hash: 0x18a64bb9996d4a556c3d9c9f558c3f6466c5e0f4deec6906fdd885f6c3bc5d00.

120. Actions taken by the Zelda Team both immediately before and after the May 8th mass wallet-blacklisting include the rapid transferring of funds, coordinated social media postings, shutting down of communication channels, and subsequent ignoring of communication of parties who reached out repeatedly to request that their wrongfully blacklisted wallet(s) be unfrozen.

121. On May 8, 2024, at 14:23:17 UTC, 12.4 ETH (worth around $39,000 at the time) was transferred from the deployer wallet to address 0x1fdcC1f5E2208E1f377c9E8f7dd6291afa75c03e, Tx hash: 0xc4161bdb8611ac1aa4cbf922fe835f88c62a290500de9bc825a8fcfa441e59ff.

122. These funds were then transferred several times before most of the funds were ultimately deposited into accounts at centralized exchanges, including Coinbase and AlphaPo.

123. These wallets are believed to be a Zelda Team-Member's personal address.

124. The Zelda 2.0's official Twitter account then posted a message stating, "SNIPERS WRECKED ** WE APPRECIATE THE THOUGHTFUL DONATIONS . . ." (Ex C at 12 – 13).

125. Additionally, the Zeldainu Twitter page, which was the previous official page, posted "TIPPITY TAPPITY TAT YOUR MONEY IS GONE LIKE THAT, MORONS! HAHA."

126. The Zelda Team then shut down the Official Telegram channel temporarily, posting "Group will re open soon. Be patient. Bot attack." (Ex. C at 14 – 15).

127. No evidence of such a bot attack was provided.

128. Most Telegram Messages before May 19, 2024 were deleted by the Team, followed by the entire Telegram once Defendants received notice to preserve evidence. (Ex. I at 4).

129. On May 10, 2024, Defendants renounced deployer wallet ownership. (Ex. G at 6).

130. This irreversible act (removing ownership permissions from the Zelda Team's control outside of pre-programmed functions such as to transfer "locked" funds to the Team as soon as they time-unlock), permanently locked the blacklisted wallets and ensured that Plaintiffs and other victims could never recover their tokens from their wrongfully frozen wallets.

131. For Plaintiff Coulton, after over a month of "investigating," Defendant Lombardi acknowledged that the victim's wallet was in fact wrongfully frozen and sent replacement tokens worth approximately $1,767.83 (6% of Coulton's initial $28,791.09. (Ex. A).

132. By this time, the value of the token had collapsed by over 90% and the liquidity pool had been nearly depleted. (Ex G at 8 – 9).

133. For Plaintiff Francis, despite numerous attempts to contact the Zelda Team, never received any response or acknowledgment of wrongful blacklisting, with the majority of his investment remaining frozen and the rest of his tokens untradable due to the withdrawn liquidity. (Ex. C at 16).

**I. Cover-up and Promises of Development**

134. As a direct consequence of these events, the market for Zelda 2.0 collapsed.

135. Defendants did not immediately wind down the project. Instead, they engaged in intermittent communications and repeated assurances that created false hope among remaining community members and discouraged liquidation of token holdings. (Exhibit J: Deleted Zelda 2.0 Telegram False Hope and Delays).

136. This conduct had the practical effect of keeping investor funds available in the liquidity pool. By encouraging holders to retain or add to their positions, Defendants ensured ready market liquidity into which the Team could sell its undisclosed or time-locked token holdings once they became transferable.

137. July 19, 2024, Lombardi urged investors to "be patient," claiming he and Real were "working on a few things" and "putting [an] army together to bring things back to life.” (Ex. J at 1).

138. On August 3, 2024, Lombardi accused several former community moderators and large holders of plotting to launch a competing token "behind [his] back" and "poaching" Zelda community members, implying this purported betrayal (rather than Defendants' conduct) caused the decline. (Ex. J at 2).

139. August 23, 2024: Lombardi again posted investors should "just be patient," stating: "Trust me when we drop the new news everyone and more will be back." (Ex. J at 8).

**J. Lavish Spending and Exotic Sports-Car Purchases**

140. By fall of 2024, Defendants' engagement with the token-holders had dwindled to every few weeks or multiple months.

141. Moderators reported that the lack of communication and promised project updates were due to hurricanes "Helene" and "Milton" (September 26 and October 9) having disrupted Lombardi's business operations and Real's residence. (Ex. J at 13, 15, 17, 21, 24).

142. During the months of claimed personal hardships, community members observed that Lombardi was showcasing lavish lifestyle on social media. (Ex. J at 13 – 14, 21, 28; Ex. E).

143. This included the purchase of a “Fishing Boat,” “Motorcycle,” “Nissan GTR,” and also “a forged carbon fire engine red LAMBORGINI URUS, on Sept 30th [2024]. . . in the middle of the hiatus from the entire DEV team.” (Ex J. at 28; Ex. E).

144. On December 15, 2024, in his first communication with the investors in months, , Mr. Lombardi told users in the official Telegram that the storms “did a number to our companies here,” and that “one of his” businesses in Siesta Key went from “doing 25k profit months to negative 10k months.” (Ex. J at 25).

145. On January 6, 2025, one frustrated investor noted in Telegram that despite constant excuses, he saw Lombardi "at the gym, in boats, [at] car meets, [and] college football games" and making new "car purchases," rather than rebuilding offices or working on the project. (Ex. J at 25).

146. By late February 7, 2025 the project’s official website was offline, the whitepaper was no longer accessible, its listing status on CoinMarketCap was updated to "Discontinued," and

the ZLDA token was delisted from at least one major exchange (BitMart) for failing to meet minimum trading volume and liquidity requirements. (Ex. J at 27-28).

147. Nearly one year after the project's launch, in a short discussion by investors who remained in the now deleted official Zelda 2.0 Telegram chat several individuals self-reported more than $123,000.00 in additional losses from Zelda project investments. This informal tally reflected only a subset of investors active in that chat at that time and does not include losses from Zelda Inu or other related investments (Ex. A at 2; Ex. J at 25-30) with aggregate harm to the broader investor base being substantially higher.

**K. Admission of Selling Undisclosed Tokens**

148. On February 17, 2025, Lombardi reappeared in Zelda 2.0 Telegram to make final announcement, claiming that months earlier "the whole mod team" and many top holders had plotted to leave project and start their own token behind his back, and this supposed betrayal greatly harmed Zelda 2.0. (Ex. J at 31-32).

149. Lombardi declared he would be "stepping away" from project and "from crypto in general," then confessing to having liquidated his personal ZLDA holding – stating "Yes I sold a few of my wallets for the first time." (Ex. J at 31-32).

150. The admission confirmed that Defendant Lombardi and the Zelda Team were actively making false promises to investors about upcoming projects in order to deceive them into not selling, while Mr. Lombardi had liquidated his position.

151. Another primary reason for pushing investors to hold is that a certain percent of tokens were "locked" and would be slowly released to the Zelda Team.[1]

152. Upon these funds being released, the Team could sell them – but needed liquidity to be available or else they would be stuck with worthless Zelda 2.0 tokens.

153. As these funds are released, they are automatically sent to a Zelda Team-controlled wallet, sold, and transferred to a personally held "hot-wallet." Tx Hash: 0xa978d87391c4fa409f63549d1720eb24cb67f4a2f0f32fd7e2b3fd106400ba92 to 0x017e834f458618270d56766402cf8fde9c40108ea244bd4761f55471424b4fa4.

154. With Lombardi's departure, Zelda 2.0 had no remaining leadership and was effectively defunct.

**E. Destruction of Evidence Following Legal Notice**

155. On June 25, 2025, Plaintiffs' counsel sent Defendants formal notice letter outlining factual basis of claims and instructing Defendants to preserve all relevant records in anticipation of litigation. (Exhibit I: Legal and Spoliation of Evidence, at 5).

156. In direct response, Defendants deleted the Zelda 2.0 Telegram channel (the primary evidence repository) and 35 YouTube videos, including the incriminating May 3 AMA (setting forth "fair launch" rules and promising no insider advantages), multiple videos claiming Zelda 2.0 had donated $75,000 to dog charities; and promotional videos describing tokenomics,

[1] Team.Finance. (n.d.). ZELDA 2.0 (ZLDA) Token Vesting/Lock Details. Retrieved December 4, 2025, from https://www.team.finance/view-coin/0xB9Fa1E2c1F1199784a3e398E23e611dDA3A581cb?name=ZELDA%202.0&symbol=ZLDA&chainid=0x1

security audits, exchange listings, and staking features. (Ex. I at 1 -2, with detailed breakdown at 9-11).

157. Deleted videos also included ones in which Lombardi gives trading advice using his represented longtime success and experience. (Ex. I at p. 9).

158. On July 28, 2025, Plaintiffs sent another letter identifying the deleted content and provided another preservation notice. This was also disregarded and additional videos were deleted. (Ex. I at 7 – 11).

159. These deletions occurred despite explicit legal duty to preserve evidence, appearing calculated to prevent plaintiffs and authorities from discovering full extent of misconduct.

**F. Harm to Named Plaintiffs**

160. As a direct and proximate result of Defendants' scheme, misrepresentations, omissions, and wrongful acts alleged herein, Plaintiffs have suffered actual economic damages in an amount to be proven at trial, but currently estimated at no less than approximately $62,011.58, representing the full, out-of-pocket value of their investments in Zelda-branded tokens, calculated as the consideration paid in cryptocurrency (measured in ETH and its USD equivalent on the date of each transaction) less any proceeds received from later dispositions, as detailed in Exhibit A.

161. The full extent of Defendants' liability may exceed the damages pled due to Defendants' destruction of evidence and concealment of transaction records. Plaintiffs reserve the right to amend this Complaint to allege additional damages upon completion of forensic blockchain analysis.

## V. CLAIMS FOR RELIEF

### COUNT I
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### (Against All Defendants)

162. Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

163. At all relevant times, the Zelda Inu and Zelda 2.0 tokens were securities within the meaning of Section 2(1) of the Securities Act, 15 U.S.C. § 77b(a)(1), and Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10). Plaintiffs and other investors invested money in the form of established cryptocurrencies in a common enterprise with a reasonable expectation of profits to be derived from the entrepreneurial and managerial efforts of Defendants.

164. Defendants, directly or indirectly, by use of the means and instrumentalities of interstate commerce, in connection with the purchase and sale of Zelda tokens, knowingly and intentionally employed devices, schemes, and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading; and engaged in acts, practices, and courses of business that operated as a fraud and deceit upon purchasers, including: falsely claiming $75,000 in charitable donations; representing "100% Locked Liquidity"; stating teammates would be "buying at launch" while having pre-positioned wallets; and promising "smooth 500X" returns, among other things.

165. Defendants' scienter is established by the blacklist function having been intentionally coded into the smart contracts from inception, the 2022 blacklisting of investor "Edgar S." served as a technical and operational rehearsal for the larger-scale taking, the May 3, 2024 AMA created a false pretext for blacklistings, the coordinated execution on May 8, 2024 – simultaneous mass blacklisting and withdrawal of 12.4 ETH – followed by public taunts

("TIPPITY TAPPITY TAT YOUR MONEY IS GONE"), demonstrates premeditation. The destruction of evidence after June 25, 2025 litigation notice establishes consciousness of guilt.

166. Plaintiffs justifiably relied on Defendants' material misrepresentations in purchasing Zelda tokens.

167. As a direct and proximate result of Defendants' fraudulent scheme, misrepresentations, and material omissions as alleged herein, Plaintiffs have suffered actual economic damages in an amount to be proven at trial, but currently estimated at no less than $62,011.58. This sum represents the out-of-pocket loss sustained by Plaintiffs, calculated as the difference between the artificially inflated price Plaintiffs paid for the Zelda 2.0 tokens – induced by the false representations of "100% locked liquidity," "fair launch," and "charitable utility" – and the true value of said tokens at the time of purchase, which was effectively zero in light of the blacklist code and Defendants' undisclosed intent to misappropriate the liquidity pool. Plaintiffs also assert entitlement to prejudgment interest at the maximum statutory rate to compensate for the loss of use of these funds; the precise amount of damages will be established through expert analysis of blockchain transactions and cryptoasset prices at relevant times.

**COUNT II**

**Violation of Sections 5 and 12(a)(1) of the Securities Act**
**(Against Defendants Lombardi, Yonker, Real, Morrow, and Messier)**

168. Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

169. This claim is brought pursuant to Section 12(a)(1) of the Securities Act, 15 U.S.C. § 77l(a)(1).

170. Defendants offered and sold unregistered securities through general solicitations via internet, social media platforms, YouTube videos, and mass communication methods.

171. No registration statement was filed with the SEC or was in effect with respect to the Zelda tokens, in violation of Sections 5(a) and 5(c) of the Securities Act.

172. Defendants are "sellers" within the meaning of Section 12(a)(1).

173. Defendant Lombardi directly solicited Plaintiffs and other investors through his leadership of the May 3, 2024 YouTube AMA, his numerous promotional videos containing false promises of '500X' returns, and his public statements on Telegram, motivated by his direct financial interest.

174. Defendant Yonker solicited purchases through his role as "Top Developer" and participation in promotional activities.

175. Defendants Real solicited purchases through his administrative authority in Telegram, participation in promotional AMAs, and community management role.

176. Defendant Morrow, Defendant Lombardi, and Defendant Yonker developed and maintained the tokens' smart contract for Zelda 2.0.

177. Defendant Messier was compensated to promote and solicit purchases through his marketing company.

178. Pursuant to Section 12(a)(1) of the Securities Act, Plaintiffs are entitled to, and hereby demand, rescission of their investment transactions. Plaintiffs hereby tender their Zelda 2.0 tokens to Defendants (or, in the alternative, seek a judicial declaration that such tender is futile

given the worthlessness of the asset) and demand the immediate return of the full consideration paid, totaling approximately $62,011.58, plus statutory interest from the date of each respective purchase. To the extent any Plaintiffs have disposed of their tokens, they seek rescissory damages representing the difference between the purchase price and the proceeds of such sale.

## COUNT III

### Violation of Section 20(a) of the Exchange Act
### (Control Person Liability - Against Defendants Lombardi, Yonker, and Real)

179. Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

180. The Zelda Enterprise committed primary violations of Section 10(b) of the Exchange Act and Rule 10b-5, as alleged in Count I.

181. Defendants Lombardi, Yonker, and Real (the "Control Person Defendants") each had the power to control the general affairs of the Zelda Enterprise and exercised direct control over the specific policies and practices constituting securities fraud.

182. Defendant Lombardi exercised ultimate control over the enterprise's operations, as demonstrated by his authority over the project's "deployer wallet" and his explicit directive in a private Telegram group to create "4500" fake members to artificially inflate the project's perceived popularity.

183. Defendant Yonker exercised control over the project's technical development and fraudulent mechanisms, as demonstrated by his role as the designated "Top Dev" and his assignment to review the very blacklisted wallets that were part of the scheme.

184. Defendants Real exercised control over the enterprise's marketing and community management, as demonstrated by his administrative authority in the Telegram channel to censor dissenting investors and his active participation in promotional AMAs where material misrepresentations were made.

185. Plaintiffs incorporate by reference the damages allegations in Count I. The Control Person Defendants are jointly and severally liable for the full amount of damages caused by the primary violations of Section 10(b), which is estimated to be not less than $62,011.58, plus pre-judgment interest, attorneys' fees, and costs.

## COUNT IV

### Violation of 18 U.S.C. § 1962(c) – Substantive RICO
### (Against All Defendants)

186. Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

187. At all relevant times, Defendants were persons within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

188. Defendants constituted an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Zelda Enterprise"), which engaged in and affected interstate commerce through soliciting investments globally via internet and processing transactions on international blockchain networks.

189. The Zelda Enterprise was a structured association-in-fact with a common fraudulent purpose and a clear division of labor, consisting of:

a. an executive tier (Lombardi, Yonker, Real) that conceived of and directed the fraudulent schemes

b. a technical tier (Morrow, Yonker, Lombardi) that developed the fraudulent instruments, including the tokens with a "blacklist" function; and

c. a promotional tier (Messier, John Does) that disseminated false and misleading information to induce investments.

190. Each Defendant participated in the operation or management of the Zelda Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

191. Defendants' pattern of racketeering activity consisted of numerous and predicated acts of wire fraud in violation of 18 U.S.C. § 1343, including: each interstate transmission of false promotional materials; each fraudulent token sale using interstate wire communications; the May 8, 2024 blockchain transaction transferring 12.4 ETH; and operating the scheme through hundreds of interstate communications.

192. The pattern of racketeering activity was continuous. It demonstrated closed-ended continuity, with predicate acts of wire fraud occurring repeatedly over a period of nearly four years, from 2021 through 2025. It also demonstrated open-ended continuity, as the Enterprise's core business model was the sequential launching of fraudulent cryptocurrency projects. The progression from Zelda Inu to Zelda 2.0 shows that the racketeering activity was the Enterprise's regular way of doing business and posed a distinct threat of continuing indefinitely had it not been exposed.

193. By reason of the Defendants' violation of 18 U.S.C. § 1962(c), specifically through the pattern of racketeering activity comprising repeated acts of wire fraud and related predicate acts as alleged herein, Plaintiffs have been injured in their business and property in an amount to be determined at trial but estimated to be not less than $62,011.58. The injury consists of the theft and conversion of cryptocurrency assets with a cost basis detailed in Exhibit A. Pursuant to the mandatory provisions of 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover threefold their actual damages, totaling approximately $186,034.74, exclusive of costs and reasonable attorneys' fees. This amount does not include additional damages that may be established through discovery of Defendants' complete financial records and blockchain transactions, nor does it include pre-judgment interest as permitted by law.

## COUNT V

### RICO Conspiracy: 18 U.S.C. § 1962(d)
### (Against All Defendants)

194. Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

195. Defendants conspired to violate 18 U.S.C. § 1962(c) by agreeing to conduct and participate in the affairs of the Zelda Enterprise through a pattern of racketeering activity.

196. The conspiratorial agreement can be inferred from the defendants' highly coordinated and interdependent actions, which would have been impossible to execute without a prior meeting of the minds. Specifically, the simultaneous mass-blacklisting of investor wallets and the immediate withdrawal of 12.4 ETH on May 8, 2024, required the seamless coordination of the Defendants responsible for technical functions (Morrow, Yonker, Lombardi) and financial

control (Lombardi), demonstrating a clear and pre-existing agreement to conduct the enterprise's affairs through wire fraud.

197. Each Defendant manifested agreement to join the conspiracy through coordinated actions: developing tokens with blacklist functions, disseminating false promotional materials, executing mass blacklistings, withdrawing investor funds, and collectively destroying evidence after June 25, 2025 litigation notice.

198. Plaintiffs were injured in their business and property as a direct and proximate result of overt acts committed by co-conspirators in furtherance of the conspiracy.

199. Plaintiffs are entitled to recover damages for the RICO conspiracy pursuant to 18 U.S.C. § 1964(c) on the same basis as Count IV, including treble damages of not less than $186,034.74, plus costs and reasonable attorneys' fees. All Defendants are jointly and severally liable for damages caused by co-conspirators' overt acts.

## COUNT VI
## Common Law Fraud
## (Against All Defendants)

200. Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

201. Defendants made false representations of material fact to Plaintiffs with intent to induce token purchases, including: On May 3, 2024, via YouTube AMA, when Defendants falsely stated the launch would be "fair" with teammates "buying at launch" without whitelist advantages; throughout 2024, falsely representing "$75,000" in charitable donations and "100% Locked Liquidity"; and asserting investors get ready for "smooth 500X" returns.

202. When Defendants made these representations, they knew they were false or made them with reckless disregard for truth, as demonstrated by: the pre-existing blacklist function coded into the smart contract; Lombardi's directive on February 27, 2022 to create "4500 fake members" before claiming organic community growth; and the operational test run conducted against "Edgar S." in May 2022, proving the blacklist function's effectiveness for asset seizure.

203. Defendants intended Plaintiffs to rely on these false statements in purchasing tokens.

204. Plaintiffs justifiably relied on Defendants' misrepresentations, believing the project was secure, fair, and charitable.

205. As a direct and proximate result of Defendants' fraud, Plaintiffs have suffered out-of-pocket damages of not less than $62,011.58, being the full amount of their investments, together with prejudgment interest and such exemplary damages as the Court may award under Michigan law in light of the egregious nature of the deception, including the false charitable narrative and taunting of victims.

## COUNT VII
## Aiding and Abetting Fraud
## (Against Morrow, Messier, XDRIP Digital Management LLC, and John/Jane Does 1-20)

206. Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

207. Defendants Lombardi, Yonker, and Real committed primary fraud against Plaintiffs as set forth in Count VI.

208. Defendants Morrow, Messier, XDRIP Digital Management LLC, and John/Jane Does 1-20 had actual knowledge of the fraudulent scheme and directly moderated the Telegram channels

in which victims repeatedly notified them of the fraudulent scheme alleged including wrongful blacklistings.

209. These Defendants substantially assisted the primary fraudsters by, among other things: Messier providing paid marketing and promotional services to expand the scheme's reach; Morrow providing technical services in connection with the smart contracts and launch infrastructure; XDRIP Digital Management LLC providing promotional, branding, or infrastructure support; and John/Jane Does moderating the online communities to suppress dissent and remove or silence investors who raised concerns about wrongful blacklistings and missing funds. But for the substantial, knowing assistance provided by these Defendants, the primary fraud could not have succeeded on the scale alleged.

210. As a direct and proximate result of these Defendants' aiding and abetting, Plaintiffs suffered damages of approximately $62,011.58. Plaintiffs incorporate by reference the damages allegations in Count VI. Aiding and abetting Defendants are jointly and severally liable for the full amount of damages caused by the primary fraud, estimated to be not less than $62,011.58, plus exemplary damages and attorneys' fees.

**COUNT VIII**
**Violation of MCL § 600.2919a – Statutory Conversion**
**(Against All Defendants)**

211. Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

212. Under Michigan Compiled Laws § 600.2919a, a person damaged by another's conversion of property to their "own use" may recover treble damages.

213. Defendants wrongfully exerted dominion over Plaintiffs' property by using the "Blacklist" function to freeze the wallets of Plaintiffs.

214. Defendants converted this property to their "own use" by taking – through the direct transfer or sale of undisclosed token holdings – from the liquidity pool to personal wallets, and subsequently using the funds to purchase personal luxury assets, specifically the Lamborghini Urus and Nissan GTR documented in Exhibit E. This forensic linkage between the stolen funds and the luxury purchases satisfies the statutory standard for "own use" under MCL § 600.2919a(1)(a).

215. By converting Plaintiffs' property to their own use, Defendants are liable under MCL § 600.2919a(1)(a).

216. Pursuant to MCL § 600.2919a, Plaintiffs are entitled to recover three times their actual damages sustained, plus costs and reasonable attorneys' fees, which is an amount not less than three times Plaintiffs' actual damages, currently estimated at approximately $186,034.74, plus costs and reasonable attorneys' fees.

**COUNT IX**
**Violation of Michigan Consumer Protection Act (MCL § 445.901 et seq.) ("MCPA")**
**(Against All Defendants)**

217. Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

218. Defendants engaged in trade or commerce and used deceptive acts or practices in violation of MCL § 445.903, including but not limited to by:

a. Causing confusion as to: sponsorship (False Certik Audits).

b. Representing goods have benefits they do not have (falsely representing charitable donations of $75,000 through Zelda 2.0);

c. Advertising with intent not to dispose of goods as represented (Promising a "fair launch" and falsely representing "100% Locked Liquidity" while planning a “rug pull”);

d. Falsely promising "500X" and "350X" returns;

e. Falsely claiming Certik KYC, audits, and security;

f. Wrongful premeditated use of the blacklist function.

219. Plaintiffs suffered an ascertainable loss of money in an amount to be proven at trial but currently estimated at not less than $62,011.58 as a direct result of Defendants' deceptive practices.

220. Pursuant to MCL § 445.911, each Plaintiff is entitled to recover their actual damages or $250, whichever is greater, together with reasonable attorneys' fees and costs. Plaintiffs' actual damages of $62,011.58 far exceed the statutory minimum.

221. The "Regulated Industries" exemption (MCL § 445.904), which applies only to conduct specifically authorized by a regulatory body, does not apply because the sale of unregistered securities alleged herein is unlawful and not "specifically authorized" by any regulatory body.

**COUNT X**
**Civil Conspiracy**
**(Against All Defendants)**

222. Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

223. Defendants entered into an agreement to accomplish an unlawful purpose -- to commit fraud and theft against cryptocurrency investors.

224. In furtherance of this conspiracy, Defendants committed numerous overt acts including: creating 4,500+ fake community members; disseminating false promotional materials; coordinating the May 5, 2024 token launch; executing mass blacklistings on May 6 -- 8, 2024; withdrawing investor funds; and destroying evidence after June 25, 2025 litigation notice.

225. Plaintiffs incorporate by reference the damages allegations in Counts VI, VIII, IX, and XII. All Defendants are jointly and severally liable for the full amount of damages caused by the conspiracy, estimated to be not less than $62,011.58 in compensatory damages, plus statutory treble damages where applicable.

**COUNT XI**
**Unjust Enrichment**
**(Against All Defendants - In the Alternative)**

226. Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

227. In the alternative, Plaintiffs plead unjust enrichment.

228. Plaintiffs conferred a benefit upon Defendants by investing approximately $62,011.58 in the Zelda projects.

229. Defendants voluntarily accepted and retained this benefit while knowing it was obtained through deceptive and inequitable conduct, as demonstrated by, among other things, their purchase of luxury vehicles while claiming hurricane-related hardships.

230. The circumstances of this enrichment are inequitable, and it would be unjust for Defendants to retain the benefit without paying Plaintiffs the value thereof.

231. Plaintiffs seek disgorgement of all ill-gotten gains, including but not limited to the value of the Lamborghini Urus, Nissan GTR, and other luxury assets traceable to the scheme, and imposition of a constructive trust over any identifiable assets purchased with investor funds.

**COUNT XII**
**Common Law Conversion**
**(Against All Defendants)**

232. Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

233. Plaintiffs had a possessory right to their cryptocurrency investments and the Zelda tokens they purchased.

234. Defendants wrongfully exercised dominion and control over Plaintiffs' property by freezing Plaintiff wallets through the blacklist function; preventing Plaintiffs from accessing or transferring their tokens; causing the collapse of the token through undisclosed sales and the taking of liquidity, and appropriating the value of Plaintiffs' investments for their own use.

235. Defendants' conversion was unauthorized and without Plaintiffs' consent.

236. As a direct and proximate result of Defendants’ conversion, Plaintiffs suffered damages of at least $62,011.58, representing the value of the property converted, plus any applicable prejudgment interest.

237. These damages are pled in the alternative to Count VIII (Statutory Conversion) to preserve all available remedies. Plaintiffs do not seek double recovery for the same loss and will elect their remedy at trial as permitted by law.

**XIII. Consolidated Damages Allegations**

238. As a direct and proximate result of Defendants' conduct described herein, Plaintiffs have suffered out-of-pocket losses in the amount of approximately $62,011.58 in direct, blockchain-verified investments in Zelda-branded tokens, as reflected in Exhibit A. This amount represents Plaintiffs' current base compensatory damages for purposes of this pleading and may be supplemented through information obtained or confirmed through discovery.

239. Investors who remained in the now-deleted official Zelda 2.0 Telegram chat self-reported aggregate losses exceeding $123,000.00, as reflected in Exhibit A at 2. This informal ledger is pleaded solely to establish the scale and continuity of the fraudulent enterprise under 18 U.S.C. § 1962(c) and is not alleged as recoverable damages on behalf of any non-party.

240. Upon information and belief, total investor losses across both projects exceed several hundred thousand dollars. The full transactional detail necessary to quantify Plaintiffs' damages (and any additional victims) will be established through forensic blockchain analysis, exchange records, banking records, and other discovery.

241. Plaintiffs' damages include, but are not limited to:

a) loss of principal investment;

b) loss of use of funds and opportunity costs;

c) investigation and tracing costs;

d) attorneys' fees and litigation expenses where authorized by statute; and

e) pre-judgment interest at the rate prescribed by 15 U.S.C. § 78aa for federal securities claims and MCL § 600.6013 for state-law claims, and post-judgment interest as of right under 28 U.S.C. § 1961 and MCL § 600.6013.

242. Under 18 U.S.C. § 1964(c) Plaintiffs are entitled to treble the actual damages they sustain, together with costs of suit and reasonable attorneys' fees.

243. Under MCL § 600.2919a Plaintiffs are entitled to treble their actual damages, plus costs and reasonable attorneys' fees, for property converted in violation of that statute.

244. Under Securities Act § 12(a)(1), 15 U.S.C. § 77l(a)(1) Plaintiffs are entitled to rescission – return of the consideration paid for the unregistered securities, together with interest from the date of each purchase – or rescissory damages in the alternative if rescission is impracticable.

245. Under Exchange Act § 10(b)/Rule 10b-5 and Michigan common-law theories (fraud, conversion, unjust enrichment, MCPA, etc.) Plaintiffs are entitled to compensatory damages, restitution, and disgorgement, together with any enhanced or statutory remedies provided by those laws.

246. All remedies are pled in the alternative to prevent double recovery. Plaintiffs will elect their final remedy(ies) at or after trial but seek the maximum relief permitted under each applicable statute. Plaintiffs also reserve the right to amend this pleading to allege additional categories or amounts of damages as further facts, victims, and transactions are uncovered in discovery..

**VI. Prayer for Relief**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against all Defendants, jointly and severally, and award the following relief:

a) Compensatory damages in an amount to be proven at trial, but not less than Plaintiffs' currently known out-of-pocket losses of approximately $62,011.58, together with such additional amounts as may be proven for other investors and transactions;

b) Rescission and/or rescissory damages under Section 12(a)(1) of the Securities Act of 1933, including return of the consideration paid for the securities, together with interest from the date of each purchase;

c) Treble damages, costs of suit, and reasonable attorneys' fees under 18 U.S.C. § 1964(c) and MCL § 600.2919a;

d) Actual and statutory damages, together with reasonable attorneys' fees and costs, under the Michigan Consumer Protection Act, MCL § 445.901 et seq.;

e) Restitution and disgorgement of all ill-gotten gains traceable to the Zelda Inu and Zelda 2.0 schemes, and imposition of a constructive trust over all cryptocurrency, fiat funds, and other assets acquired with investor monies;

f) An accounting and tracing of all investor funds and assets received, directly or indirectly, by Defendants and any affiliated entities;

g) Appropriate injunctive and equitable relief necessary to protect the public and prevent further harm, including, as the Court deems just and proper: prohibiting Defendants from creating, promoting, or participating in any cryptocurrency projects; prohibiting Defendants from soliciting investments from the public; requiring

Defendants to disclose this lawsuit and judgment on any future business ventures; and such compliance, notice, or reporting conditions as warranted.

h) Pre- and post-judgment interest at the maximum rates allowed by 15 U.S.C. § 78aa, 28 U.S.C. § 1961, and MCL § 600.6013;

i) Such other and further legal and equitable relief as the Court may deem just.

**VII. DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted,

/s/ Michael A Chehab .
Michael A Chehab (P79912)
Blue Oak Law Firm PLLC
Attorney for Plaintiffs
38410 Westchester Rd
Sterling Heights, MI 48310
(586) 353-5289
mchehab@blueoaklawfirm.com

Date: 12/5/2025 .